**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| PATRICIA SCALISE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 22 C 3767 |
| v. | ) | |
| | ) | Judge Sara L. Ellis |
| VILLAGE OF MCCOOK, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Patricia Scalise, a former probationary police officer at the Village of McCook

("McCook"), sued McCook for allegedly firing her because of her sex in violation of Title VII.

Scalise also sued David DeLeshe (collectively with McCook, "Defendants"), the commanding

officer of McCook's police department, for violating her equal protection rights under the

Fourteenth Amendment under 42 U.S.C. § 1983. Defendants now move for summary judgment,

arguing that (1) Scalise failed to exhaust her administrative remedies, (2) McCook possessed a

non-discriminatory reason for firing Scalise, and (3) the claim against DeLeshe fails for lack of a

Title VII or constitutional violation. Scalise responds that (1) she filed an Equal Employment

Opportunity Commission ("EEOC") grievance containing sufficient facts prior to filing suit,

exhausting her administrative remedies; (2) disputed facts would allow a jury to conclude that

McCook fired her because of her sex; and (3) consequentially, her § 1983 claim against DeLeshe

must survive to trial.

The Court agrees with Scalise on each of these points. The Court, thus, denies

Defendants' motion for summary judgment.

## BACKGROUND

### I.     McCook Police Department

McCook is a town southwest of Chicago.  Its police department, the McCook Police Department ("MPD"), serves the McCook community.  In order from highest to lowest rank, its command structure consists of a chief of police, deputy chiefs of police, commanders, lieutenants, sergeants, sworn patrol officers, and probationary patrol officers.  MPD is ultimately under the purview of the McCook Board of Fire/Police Commissioners ("the Board").  The chief of police, or the Board when there is no chief, is the ultimate authority with respect to the retention or dismissal of a probationary patrol officer.  MPD hires both experienced officers and new recruits into the department.

When MPD hires new recruits, department policy requires them to clear a series of hurdles before gaining sworn patrol officer status, including an applicant testing process, a police officer basic recruit academy course, a peace officer certification examination, the McCook field training program, and a twenty-four-month probationary period.  When recruits are under probationary status, they are "subject to discipline, including discharge, without cause and with no recourse to the grievance procedure."  Doc. 44-4 at 8.

David DeLeshe, a lateral hire, joined MPD as a probationary police officer on October 2, 2018.  MPD promoted him to commander in December 2020 and then to deputy police chief in January 2022.

Patricia Scalise joined MPD as a probationary police officer on June 24, 2019.  Scalise successfully completed the applicant testing process, the basic recruit course, and peace officer certification prior to starting her field training, which took place from September 30, 2019, through December 14, 2019.

Steven Svetich was co-commander of MPD between January 10, 2021, and June 8, 2021. Because Svetich was the most senior officer in MPD at that time, he was responsible for making final decisions for MPD except for those that required Board approval. Svetich was later appointed chief of MPD.

Rachel Huedepohl was a sergeant in MPD. She was a friend to both DeLeshe and Scalise.

## II. Scalise's Field Training

One aspect of Scalise's filed training was participating in mock scenarios. Scalise demonstrated difficulties with multiple scenarios involving officer safety. One scenario that Scalise did not satisfactorily complete involved a traffic stop where the vehicle's passenger fled the scene after she initiated a traffic stop. A supervisor noted that "officer safety was an issue here" because Scalise moved her attention away from the driver to the fleeing passenger. Doc. 44-14 at 2. In a second training scenario that Scalise failed, she was supposed to order occupants out of the vehicle after spotting contraband in plain view. According to the supervisor's report, "[t]he end result in this scenario—[Scalise] was shot due to her not watching driver." Doc. 44-15 at 2. The report also reflects that Scalise understood her error in a post-scenario debrief.

Another aspect of Scalise's field training was completing eight-hour shifts with a rotating cast of more senior police officers. Scalise trained with three different officers, Officer Randy Fane, Sergeant Russell DeLude, and then-Officer DeLeshe. At the end of each shift, these supervisory officers would create daily observation reports ("DORs") that summarized Scalise's performance across different metrics and identified areas for improvement. The supervisory officer would then debrief Scalise on the contents of the DOR and the pair would sign it. On October 30, 2019, one month into Scalise's field training period, she received a DOR from

3

DeLeshe indicating that she needed additional training in five different areas: electronics communication (Scalise "struggle[d] with radio communication/ what to say or not say"), criminal statutes and ordinances (Scalise "had difficulty using Spillman/Leads"[1] to see if a driver possessed a valid license and wrote the infraction "on a P-Ticket instead of a statre [sic] ticket"), information processing (Scalise needed "to become more comfortable in daily routine"), problem solving (Scalise "need[ed] more experience handling calls and how to problem solve"), and crash scene investigation and management (Scalise had "not [previously] completed a single car hit and run"). Doc. 44-13 at 1–2.

## III.   DeLeshe's Remarks To and About Scalise

Throughout Scalise's time at MPD, DeLeshe called Scalise by a nickname. Scalise and Huedepohl understood this nickname to be "Scaleazy." *See* Doc. 44-7 at 66:5–6; Doc. 51-3 at 39:7. Scalise testified that she interpreted this nickname to mean that she was "easy sexually" and a "ho." Doc. 44-7 at 68:3–12. Huedepohl said that she understood the nickname to mean Scalise was "sleazy." Doc. 51-3 at 39:7. DeLeshe said that he called Scalise "Scalizzy." Doc. 44-1 at 197:21. He testified that he began using that nickname after hearing a different officer ask Scalise how to pronounce her name, after which that officer "started rattling all this crazy stuff and then [Scalizzy] stuck." Doc. 44-1 at 216:8–18. DeLeshe would also address Scalise by this nickname in texts: in one instance, DeLeshe texted to Scalise, "Keep u head up Scal-lizzy— u got this!!!!" to provide encouragement before a training scenario. Doc. 44-17 at 2.

Aside from the persistent use of a nickname, Scalise testified that DeLeshe made other comments to her about her career prospects at MPD. According to Scalise, during an instance when the pair were driving in the same patrol vehicle, DeLeshe "pointed at a . . . strip club in

---

[1] Spillman/Leads is the system through which officers access driver data from the Secretary of State's office when they conduct a traffic stop.

town and told [her] that [she] would make more money working there." Doc. 44-7 at 69:12–14. Scalise did not recall when this episode occurred. On a second occasion, sometime in the winter of 2020, DeLeshe asked for a Burger King application to hand to Scalise while they were eating lunch because, according to Scalise, "[she] would never make it" as "a police officer in the" MPD. *Id.* at 71:9–23. A third incident occurred when Scalise had to go to a different police station to perform a body search on a female suspect. According to Scalise, the day after she conducted the search DeLeshe asked her, "how were [the suspect's] hips?" *Id.* at 143:20–144:3.

Two other people testified about remarks DeLeshe made to them. According to Huedepohl, DeLeshe once commented that "some women don't belong in law enforcement." Doc. 51-3 at 42:12–19. Scalise's mother, Tracy Kenny, testified that DeLeshe told her that "it's not going to be easy" for Scalise working at MPD. Doc. 51-4 at 9:5–12.

## IV.     Scalise Receives Solo Patrol Assignments

Scalise completed her field training around the end of 2019. MPD required several officers, including DeLeshe, to approve her for solo patrol during which Scalise would drive a squad car with no partner. DeLeshe provided his assent but noted in an email on December 30, 2019, that "numerous issues were documented" during Scalise's simulation training. Doc. 44-16.

Two incidents after Scalise received approval to begin solo patrols stand out. In the first incident, Scalise arrived to the scene of an investigation where officers believed that someone in the vehicle had a weapon. The video evidence shows that Scalise parked in front of the police vehicles already present, an apparent safety violation under MPD policy. Scalise then stepped out of her vehicle, drew her weapon, and approached the car. She then holstered the weapon in

order to open the vehicle's trunk—Svetich testified that this was another safety violation and "demonstrated a failure to exercise basic officer safety." Doc. 44-8 ¶ 15.

In the second incident, Scalise initiated a routine traffic stop. After questioning the driver, Scalise discovered that the driver did not possess a valid license. Scalise then returned to her car after taking down the driver's name and date of birth, and searched the Secretary of State ("SOS") databank for information about the driver using the Spillman/Leads system she had trouble navigating during her training period. The squad car video captured Scalise's reactions to the Spillman/Leads output: she repeatedly said that she was "so confused" attempting to interpret the SOS data. Doc. 45 ¶ 29. Scalise then let the driver go, telling her to renew her license and drive safely. According to Svetich, who later reviewed the SOS data, the Spillman/Leads system stated that the driver never had a valid license, only once possessing a since-expired learner's permit. Svetich concluded that Scalise's conduct "posed a serious threat to public safety." Doc. 44-8 ¶ 19.

## V. Scalise's Superiors Recommend Her Discharge, and the Board Terminates Scalise

After discovering video footage of the two incidents during the course of an unrelated investigation, Svetich and DeLeshe wrote a joint letter to the Board recommending that it dismiss Scalise from MPD. Svetich and DeLeshe wrote that "Officer Scalise's maturity level does not rise to that of a law enforcement officer." Doc. 44-18. They first noted Scalise's performance issues in training scenarios, stating that she "had to redo all of her scenarios that involved officer safety situations due to her lack of awareness." *Id.* They then noted that her performance had not improved since her training scenarios concluded: Svetich and DeLeshe first wrote about the first incident described above, stating that it showed "how she does not understand officer safety issues." *Id.* Svetich and DeLeshe also wrote about Scalise's second

incident discussed above, reporting that Scalise "let a person who has never had an Illinois drivers license drive away with a warning." *Id*. They concluded by sharing their opinion "that Officer Scalise does not possess the qualities/values that the Village of McCook residents have come to expect and deserve." *Id*. The Board convened on March 2, 2021. The minute meetings state that Svetich and DeLeshe attended the meeting and spoke with the Board during an executive session. Immediately following the executive session, the Board voted to terminate Scalise. Each Commissioner swore in separate affidavits that they did not base their decision to terminate Scalise on her sex.

That evening, after the Board met and voted to terminate Scalise's probationary employment, Svetich called Scalise into his office for a meeting, which DeLeshe also attended. Svetich informed Scalise that the Board just voted to fire her, but he offered her the opportunity to sign a pre-written resignation letter instead. Scalise ultimately signed the pre-written resignation letter. She later attempted to rescind her resignation and tried to file a grievance through MPD's union.

## VI.  Scalise's Comparator Evidence

Joseph Odeh, who had prior experience as a pharmaceutical technician, and Kevin Justus, who was a military veteran with drone operation experience, were probationary police officers at the same time as Scalise. The three officers received different tasks during their time at MPD together. In addition to their regular patrol and training duties, Odeh worked to organize the evidence room, Justus operated MPD's drones, and Scalise ensured that equipment batteries had full batteries.

Odeh was involved in two car accidents while a probationary police officer. In one accident, he "jackknifed" a tractor trailer while attempting to make a sharp turn in a dead-end

7

road.  Doc. 44-1 at 184:6–8.  After this incident, Odeh went to "driving school" for corrective

training.  *Id.* at 184:22–24.  In the other accident, Odeh attempted to chase a vehicle to conduct a

traffic stop.  In quickly pulling into the road, Odeh did not see a high curb that he then impacted

with the side of his car, breaking the running board.  Aside from remedial driving school, Odeh

did not receive any discipline for these accidents.

Odeh was also involved in an incident concerning a suspect in a car crash.  Paramedics

had taken the suspect to a local hospital following the accident, and Odeh arrived at the hospital

to investigate.  Odeh spoke with a nurse who had treated the individual, and Odeh then walked

down a hallway to get better cell service to call his supervisor.  After Odeh called his supervisor,

he returned to the suspect's room only to find that the person had disappeared.  Odeh did not

receive any discipline in connection with this incident.

## VII.    Scalise's EEOC Complaint

On May 19, 2021, Scalise filed an EEOC complaint.  In it, she wrote that DeLeshe "made

offensive and unwelcome comments to me regarding my gender, including but not limited to

calling me sleazy, and telling me that I would make more money working in a strip club."  Doc.

44-32.  She further wrote that DeLeshe said "on several occasions that women have no business

working as police officers."  *Id.*  Scalise also reported that "DeLeshe discharged [her] from [her]

job on March 2, 2021 . . . even though he did not explain the basis for his decision, or ever warn

[her] about any problems."  *Id.*  Scalise claimed that other male probationary police officers

accused of serious misconduct were not terminated, and that she believed DeLeshe caused

McCook to fire her because of her sex.  On May 16, 2022, the EEOC issued Scalise a Notice of

Right to Sue.  She initiated this case on July 21, 2022.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To determine whether a genuine dispute of material fact exists, the Court must pierce the pleadings and assess the proof as presented in depositions, documents, answers to interrogatories, admissions, stipulations, and affidavits or declarations that are part of the record. Fed. R. Civ. P. 56(c)(1); *A.V. Consultants, Inc. v. Barnes*, 978 F.2d 996, 999 (7th Cir. 1992). The party seeking summary judgment bears the initial burden of demonstrating that no genuine dispute of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Bunn v. Fed. Deposit Ins. Corp. for Valley Bank Ill.*, 908 F.3d 290, 295 (7th Cir. 2018). "A genuine issue of material fact exists when 'there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" *Brown v. Osmundson*, 38 F.4th 545, 549 (7th Cir. 2022) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). In response, the non-moving party cannot rest on mere pleadings alone but must use the evidentiary tools listed above to identify specific material facts that demonstrate a genuine dispute for trial. Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 324; *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 627 (7th Cir. 2014). The Court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Wehrle v. Cincinnati Ins. Co.*, 719 F.3d 840, 842 (7th Cir. 2013). However, a bare contention by the non-moving party that an issue of fact exists does not create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), and the non-moving party is "only entitled to the benefit of inferences supported by admissible evidence, not those 'supported by only speculation or conjecture,'" *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (citation omitted).

## ANALYSIS

The Court begins with the threshold issue of administrative exhaustion. It next considers whether Scalise's Title VII claim against McCook survives summary judgment. Finally, it does the same for her § 1983 claim against DeLeshe.

## I.    Administrative Exhaustion

Defendants first argue that Scalise failed to exhaust her administrative remedies before the EEOC. If Scalise indeed failed to exhaust her administrative remedies, then she would not be allowed to pursue her claims. *See Lavalais v. Vill. of Melrose Park*, 734 F.3d 629, 634 (7th Cir. 2013) ("Generally, 'a Title VII plaintiff cannot bring claims in a lawsuit that were not included in her EEOC charge.'" (quoting *Cheek v. W. & S. Life Ins. Co.,* 31 F.3d 497, 500 (7th Cir. 1994)). But the EEOC complaint need not perfectly track the later-filed complaint, and "[c]ourts review the scope of an EEOC charge liberally." *Huri v. Off. of the Chief Judge of the Cir. Ct. of Cook Cnty.*, 804 F.3d 826, 831 (7th Cir. 2015). "[A] plaintiff can still bring [claims not included in the EEOC charge] if they are 'like or reasonably related to the allegations of the [EEOC] charge and growing out of such allegations.'" *Moore v. Vital Prods., Inc.,* 641 F.3d 253, 256–57 (7th Cir. 2011) (quoting *Jenkins v. Blue Cross Mut. Hosp. Ins., Inc.*, 538 F.2d 164, 167 (7th Cir. 1976)). "To be 'like or reasonably related,' the relevant claim and the EEOC charge 'must, at minimum, describe the same conduct and implicate the same individuals.'" *Id.* at 257 (quoting *Cheek*, 31 F.3d at 501).

In her EEOC charge, Scalise said that DeLeshe "made offensive and unwelcome comments to me regarding my gender, including but not limited to calling me sleazy, and telling me that I would make more money working in a strip club." Doc. 44-32. She also reported Deleshe as saying "on several occasions that women have no business working as police

officers." *Id.* Scalise also stated that "DeLeshe discharged [her] from [her] job on March 2, 2021 . . . even though he did not explain the basis for his decision, or ever warn [her] about any problems." *Id.* Scalise claimed that other male probationary police officers accused of serious misconduct were not terminated, and that she believed DeLeshe caused McCook to fire her because of her sex. *Id.*

Defendants argue that Scalise's failure to include specific legal theories like "constructive discharge or a cat's paw theory of liability" means that her EEOC complaint was deficient. Doc. 50 at 19. But "[m]ost EEOC charges are . . . drafted by laypersons rather than lawyers," *Huri*, 804 F.3d at 831, and it is unfair to demand "an exact correspondence between the words of the EEOC charge and the judicial complaint." *Babrocky v. Jewel Food Co.,* 773 F.2d 857, 865–66 (7th Cir. 1985). Rather, the Court looks at the facts Scalise included in her EEOC complaint and asks whether they are "like or reasonably related" to her federal pleading. *Cheek*, 31 F.3d at 501.

Here, the Court does not even need to "liberally" construe Scalise's EEOC charge to conclude that the claims she asserts here relate to the grievance she brought before the agency. *Huri*, 804 F.3d at 831. Scalise notes in her complaint many of the same sexist comments that she attributes to DeLeshe in her EEOC charge. And Scalise's chief grievance in her complaint—that DeLeshe caused McCook to fire her because of her sex—is the same as the adverse employment action of which she complains in her EEOC charge. Indeed, it is for this reason that Defendants' comparison with Scalise's EEOC claim and the one at issue in *Herron v. DaimlerChrysler Corp.*, 388 F.3d 293 (7th Cir. 2004), is unpersuasive. In that case, the court noted that although the plaintiff "described racial discrimination, retaliation, and harassment" in his EEOC complaint, he failed to allege that he was constructively discharged and that "the four-month delay between his February EEOC complaint and his decision to leave was inconsistent with notice of constructive

11

discharge." *Herron*, 388 F.3d at 303 n.2. Here, Scalise not only reported to the EEOC that DeLeshe made inappropriate remarks based on her sex, but also that he "discharged [her] from [her] job" Doc. 44-32. Although one could distinguish Scalise's resignation (under duress) from termination (indeed, McCook attempts to do so—and the Court will address this argument below), Scalise's framing does not bear on whether her EEOC charge is "like or reasonably related" to her complaint. *Cheek*, 31 F.3d at 501.

The Court finds that Scalise exhausted her administrative remedies, so it will evaluate whether sufficient evidence exists for a jury to find in her favor at trial.

## II.     Title VII Claim Against McCook

To start, the parties argue their cases for and against summary judgment under different legal frameworks. *Compare* Doc. 50 at 5 (arguing the *McDonnell Douglas Corp. v. Green* burden-shifting framework for discrimination claims, 411 U.S. 792, 802 (1973)), *with* Doc. 51 at 10 (arguing the *Ortiz v. Werner Enterprises* "reasonable fact finder" standard for discrimination claims, 834 F.3d 760, 765 (7th Cir. 2016)). Under *McDonnell Douglas*, the Court analyzes the evidence through a burden-shifting framework where the plaintiff first establishes a *prima facie* case of discrimination, in which case the burden shifts to the defendant. The defendant can then provide a legitimate justification for firing the plaintiff, in which case the plaintiff again bears the burden of showing that the justification is pretext. *See Stewart v. Henderson*, 207 F.3d 374, 376 (7th Cir. 2000). Under *Ortiz*, the Court simply considers whether the plaintiff presented evidence that would allow a jury to find that the defendant fired her because of her sex. 834 F.3d at 764. The Court "look[s] at the evidence in the aggregate to determine whether it allows an inference of prohibited discrimination." *Vichio v. US Foods, Inc.*, 88 F.4th 687, 691 (7th Cir. 2023). The Seventh Circuit has instructed that the plaintiff can elect to proceed under either—or

both—frameworks. *See id.* ("In our circuit, plaintiffs can rely on two frameworks to show discrimination."). Because Scalise chose to argue the *Ortiz* method of proving discrimination, the Court reviews the evidence through that lens alone.[2]

"In order to make out a case of sex discrimination without resorting to *McDonnell Douglas*, a plaintiff must provide either direct or circumstantial evidence that supports an inference of intentional discrimination." *Joll v. Valparaiso Cmty. Sch.*, 953 F.3d 923, 929 (7th Cir. 2020) (quoting *Coffman v. Indianapolis Fire Dep't*, 578 F.3d 559, 563 (7th Cir. 2009)). The Seventh Circuit has "identified three broad types of circumstantial evidence that will support an inference of intentional discrimination: ambiguous or suggestive comments or conduct; better treatment of people similarly situated but for the protected characteristic; and dishonest employer justifications for disparate treatment." *Id.* (citing *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994)). The presence or absence of any particular category of evidence is not dispositive, however. *See id.* at 933 (when plaintiff "does not rely solely on *McDonnell Douglas*, she may survive summary judgment even without evidence that the employer's explanation [for firing her] is dishonest"). "[T]he controlling question is whether a reasonable jury could find prohibited discrimination." *Groves v. S. Bend Cmty. Sch. Corp.*, 51 F.4th 766, 769–70 (7th Cir. 2022) (citations omitted).

_____

[2] Defendants argue that the Court should nevertheless analyze this case under the *McDonnell Douglas* framework because Scalise relies on circumstantial evidence and filed a complaint citing a similarly situated colleague, which is relevant to an element of the *McDonnell Douglas* test. However, when parties raise "performance as the reason for [the employee's] termination, [the Court] need not consider [the employee's] prima facie case under *McDonell Douglas* or conduct a separate analysis of the facts under" *Ortiz*. *Vichio*, 88 F.4th at 691. Defendants argue that they legitimately terminated Scalise, so the Court can safely proceed with its analysis through her chosen framework. *See id.* ("We answer the same question under either test: whether [plaintiff] has presented sufficient evidence that would allow a reasonable jury to find that [defendant] engaged in prohibited [sex] discrimination.").

13

### A.    Adverse Employment Action

Regardless of the legal framework the plaintiff selects, any Title VII claim must stand on an adverse employment action.  *See Ortiz*, 834 F.3d at 765 (requiring proof that discrimination "caused the discharge or other adverse employment action").  McCook disputes whether Scalise suffered one, despite the undisputed facts showing that (1) Svetch and DeLeshe recommended Scalise's discharge from MPD; (2) the Board voted to terminate her employment; and (3) Svetch notified Scalise of the Board's decision to terminate her, but offered her the opportunity to resign instead, which Scalise accepted.  Indeed, McCook touts this choice—to the extent that it was one—as a positive fact that protects it from liability, arguing that Scalise did not suffer an adverse employment action because she "was given the option to accept dismissal or resign and she resigned."  Doc. 50 at 5.  This distinction without a difference is sufficient for a jury to conclude that Scalise suffered an adverse employment action.  *See, e.g.*, *Palka v. Shelton*, 623 F.3d 447, 453 (7th Cir. 2010) ("coerced resignation," a form of involuntary termination, "is characterized by the presence of a Hobson's choice in which the employee must resign or suffer severe consequences"); *Patterson v. Portch*, 853 F.2d 1399, 1405-06 (7th Cir. 1988) ("[C]oerced resignation, . . . is treated in law as the equivalent of outright discharge[.]" (citing *Parrett v. City of Connersville*, 737 F.2d 690, 694 (7th Cir. 1984))).

The Court finds that the undisputed evidence would allow a reasonable jury to find that Scalise suffered an adverse employment action.

### B.    Causation

The Court next considers whether there is sufficient evidence that would allow a jury to conclude that McCook fired Scalise because of her sex.  *See Ortiz*, 834 F.3d at 764.  Evidence of "ambiguous or suggestive comments or conduct; better treatment of people similarly situated but

for the protected characteristic; and dishonest employer justifications for disparate treatment" can show unlawful discrimination. *Joll*, 953 F.3d at 929. The Court reviews this evidence "as a whole" to assess the case's "overall likelihood of discrimination." *Ortiz*, 834 F.3d at 765, 763. Scalise relies on the following circumstantial evidence: first, she points to DeLeshe's persistent use of the nickname "Scalizzy" or "Scaleazy" to refer to her throughout her employment with MPD, sex-based remarks about her performance as a police officer, and prior comments to another officer about his view of women in policing as evidence that he possessed discriminatory motive. Second, she points to Joseph Odeh and Kevin Justus, male probationary police officers, whom she contends MPD treated more favorably with respect to discipline and task assignments. Third, Scalise claims that Defendants' justification for her termination—performance issues—is pretextual. With the entire record in view, the Court finds that Scalise brings forward enough evidence for a reasonable jury to find that McCook discriminated against her because of her sex, meaning that her claim against the Village can proceed to trial. *See Brown*, 38 F.4th at 549 ("A genuine issue of material fact exists when there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." (internal quotation marks omitted)).

The Court begins with the evidence of "ambiguous or suggestive comments." *Joll*, 953 F.3d at 929. This is Scalise's strongest evidence, consisting of DeLeshe's arguably sexist nickname for her, his remarks about Scalise's career prospects at MPD versus employment elsewhere, his question to Scalise about a female arrestee's hips, and his comment that "some women don't belong in law enforcement." Doc. 51-3 at 42:12–19.

DeLeshe called Scalise, "Scalizzy" and/or "Scaleazy" throughout her employment with MPD. DeLeshe asserted that the nickname was benign: he said that he started calling her that when another officer riffed off of various pronunciations of Scalise's last name. *See* Doc. 44-1 at

15

216:8–18.  Scalise interpreted her nickname differently: she said that she felt DeLeshe was implying that she was "easy sexually" and a "ho" by using this nickname.  Doc. 44-7 at 68:3–12.  Huedepohl's testimony bolsters Scalise's interpretation: she said that she heard DeLeshe call Scalise, "Scaleasy.  Like – like sleazy."  Doc. 51-3 at 39:7.  Although DeLeshe's intent is disputed, what is not is that DeLeshe used the nickname across in-person interactions and through text messages.  For example, DeLeshe sent a text message to Scalise before a training scenario saying, "Keep u head up Scal-lizzy—u got this!!!!"  Doc. 44-17 at 2.  Scalise said that she did not feel comfortable telling DeLeshe that she disliked the nickname.  Doc. 44-7 at 68:2.

Scalise has additional evidence of discriminatory animus in the form of remarks that DeLeshe made about women in law enforcement generally, and about Scalise's career personally.  *See Vega v. Chi. Park Dist.*, 954 F.3d 996, 1005 (7th Cir. 2020) ("[B]ehavior toward or comments directed at other employees in the protected group is one type of circumstantial evidence that can support an inference of discrimination." (citation omitted) (internal quotation marks omitted)).  With respect to DeLeshe's general remarks, Huedepohl testified that DeLeshe said that "some women don't belong in law enforcement."  Doc. 51-3 at 42:12–19.  DeLeshe denies ever saying this, but that only creates a dispute of material fact for a jury to resolve.  *See Gupta v. Melloh*, 19 F.4th 990, 996 (7th Cir. 2021) ("Where the material facts specifically averred by one party contradict the facts averred by a party moving for summary judgment, the motion must be denied.").  With respect to DeLeshe's comments involving Scalise specifically, Scalise provided testimony about two incidents that a reasonable jury could connect with DeLeshe's purported statement about women to find credible her claim of sex-based discrimination.  First, Scalise recounted that during a shift when she was working with DeLeshe during her training period, he "pointed at a . . . strip club in town and told [her] that [she] would

16

make more money working there." Doc. 44-7 at 69:12–14. Second, DeLeshe once asked for a Burger King application to hand to Scalise while the pair were having lunch because "[she] would never make it" as "a police officer in the" MPD. *Id.* at 71:9–23. A reasonable jury could infer that DeLeshe made these comments about Scalise because of his view that some women do not belong in law enforcement.

Defendants argue that the stray remarks doctrine, which holds that "[i]solated comments that are no more than stray remarks in the workplace are insufficient to establish that a particular decision was motivated by discriminatory animus," *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 491 (7th Cir. 2007), *overruled on other grounds by Ortiz*, 673 F.3d 670, prevents Scalise from basing her claim on DeLeshe's comments. Yet as the Seventh Circuit has instructed, the only thing the stray remarks doctrine informs us "is that the fact that someone who is not involved in the employment decision of which the plaintiff complains expressed discriminatory feelings is not evidence that the *decision* had a discriminatory motivation." *Hunt v. City of Markham*, 219 F.3d 649, 652–53 (7th Cir. 2000). As the Court will discuss in greater depth below, DeLeshe was significantly involved with the Board's decision to terminate Scalise. As such, his "remarks are evidence" directly probative of potential discriminatory animus. *Emmel v. Coca-Cola Bottling Co. of Chi.*, 95 F.3d 627, 632 (7th Cir. 1996). Taken as a whole, they suffice to provide "direct evidence of discrimination even if the evidence stops short of a virtual admission of illegality." *Venters v. City of Delphi*, 123 F.3d 956, 973 (7th Cir. 1997).

Second, the Court evaluates Scalise's identified comparator, Joseph Odeh. For them to be suitable comparators, they must have "dealt with the same supervisor, [been] subject to the same standards, and . . . engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Gates v.*

*Caterpillar, Inc.*, 513 F.3d 680, 690 (7th Cir. 2008) (quoting *Snipes v. Ill. Dep't of Corr.*, 291 F.3d 460, 463 (7th Cir. 2002) (internal quotation marks omitted)). "Whether a comparator is similarly situated is 'usually a question for the fact-finder,' and summary judgment is appropriate only when 'no reasonable fact-finder could find that plaintiffs have met their burden on the issue.'" *Coleman v. Donahoe*, 667 F.3d 835, 846–47 (7th Cir. 2012) (quoting *Srail v. Vill. of Lisle*, 588 F.3d 940, 945 (7th Cir. 2009)).

Scalise first complains that both Odeh and Justus received preferential treatment with respect to job assignments, because Odeh was in charge of the evidence room, Justus was responsible for drone operation, and Scalise had battery-charging duties. The Court agrees with Defendants' contention that a less-interesting job assignment does not rise to the level of discrimination, especially when Odeh and Justus had relevant experience in their respective tasks. *See Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 384 (7th Cir. 2020) ("A reassignment of job duties is not 'materially adverse' unless it is a 'significant' change that is 'often reflected by a corresponding change in work hours, compensation, or career prospects.'" (quoting *Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720, 727 (7th Cir. 2003))). Moreover, whether Scalise's job was less interesting or not as high on the hierarchy of jobs MPD officers assigned to their probationary colleagues is not particularly relevant to the injury Scalise complains of here, which is that Defendants fired her because of her sex.

Scalise next points to Odeh's multiple car accidents and the incident where Odeh (in Scalise's words) "lost a prisoner" as evidence that Defendants singled her out for punishment when a male colleague had a similar record of safety issues. Doc. 51 at 13. Defendants attempt to minimize Odeh's hospital incident as "one act of poor judgment, not a failure to understand the essentials of the job." Doc. 50 at 9. But Defendants also only point to one specific incident

involving Scalise's inability to interpret the Spillman/Leads output while on solo patrol as justification for firing her. Moreover, Defendants contend in conclusory fashion that no "car accident [is] similar conduct as to establish Odeh a comparator with Scalise[,]" describing his driving record as rumor. Doc. 58 at 8. But Huedepohl answered questions during her deposition about Odeh's driving history, Doc. 51-3 at 48:12–50:14, and DeLeshe said that getting into car accidents is a "problem," Doc. 44-1 at 183:22, removing it from the realm of rumor to a disputed fact that a jury could consider.

A reasonable jury could instead interpret Odeh's poor driving and his inability to keep secure a person in the hospital under police investigation as posing a public safety issue and failure to perform basic job tasks—the same justifications Defendants provided for terminating Scalise. And the law requires Defendants to conclusively show that *no* reasonable jury could find a comparator is similarly situated to Scalise to win summary judgment—a burden that they cannot carry here. *See Robertson*, 949 F.3d at 384.

Defendants also argue that Scalise and Odeh did not have the same supervisor, because MPD had a chief of police with firing authority when Odeh lost the suspect in the hospital while the Board was responsible for making such decisions when it terminated Scalise. The change in the ultimate hiring and firing authority in the period between Odeh's incident and Scalise's termination is not material; DeLeshe was superior to both officers throughout both incidents and, as discussed below, plausibly acted as the ultimate authority for Scalise's termination through a cat's paw theory of liability. *Cf. Coleman*, 667 F.3d at 848 (co-workers shared same supervisor for disciplinary purposes even when subject to different immediate supervisors).

Finally, the Court considers Scalise's evidence that McCook's justification for terminating her—that she was simply a bad police officer—is dishonest. "[T]he pertinent

19

question is whether [Defendants'] evidence as to the legitimate reasons for terminating [plaintiff] eliminates any doubt as to whether [sex] played at least a motivating role in her discharge." *Venters*, 123 F.3d at 974.

Here, Defendants argue that McCook legitimately terminated Scalise. They argue that Scalise was a probationary police officer throughout her tenure with MPD, and as such the chief of police or other authority responsible for MPD was able to fire her for any reason or no reason at all—and Scalise, through her poor safety record and on-the-job performance as described in DeLeshe and Svetich's letter to the Board, provided her supervisors with ample reason to terminate her employment before she attained full officer status.

This is a plausible story that a reasonable jury could believe to determine that McCook did not discriminate against Scalise because she is female. Even if it were the only story, it would still not defeat Scalise's claim. Because she "does not rely solely on *McDonnell Douglas*, she may survive summary judgment even without evidence that the employer's explanation is dishonest." *Joll*, 953 F.3d at 933.

Yet, Defendants' story is not the only version of events that a jury could believe. Scalise has a plausible narrative as well. She argues that the fact that she successfully passed her field training and had solo patrol duties demonstrates her fitness to serve. She points to Huedepohl's testimony that Scalise was qualified based on Hudepohl's (self-admittedly limited) observations of Scalise's field work, the lack of documentation regarding her supposed safety issues on solo patrol that DeLeshe and Svetich cited in their letter, and Defendants' repeated insistence that she chose to resign from MPD—when the Board actually terminated her—as other factors supporting her argument that Defendants' story is false. And lurking in the background is Scalise's evidence of DeLeshe's arguable sex-based animus and her comparator evidence, which

cast a dark shadow over McCook's otherwise legitimate reason for terminating her—especially when DeLeshe helped pen the letter that led to her termination. Together, these factors fail to "eliminate[] any doubt as to whether [sex] played at least a motivating role in her discharge." *Venters*, 123 F.3d at 974 (7th Cir. 1997).

Accordingly, taking the evidence as a whole, the Court finds that Scalise has presented a triable question of fact as to whether sex-based discrimination caused McCook to discharge her. *See Ortiz*, 834 F.3d at 765.

### C. Whether McCook Can Be Liable for DeLeshe's Discriminatory Comments

McCook's final argument is that Scalise cannot hold it liable for DeLeshe's alleged remarks under a "cat's paw" theory of liability. "Under this theory, an employer is liable if a non-decision-maker who is motivated by discriminatory bias is a proximate cause of another employee's adverse employment action." *Nichols v. Mich. City Plant Plan. Dep't*, 755 F.3d 594, 604 (7th Cir. 2014). Scalise argues that DeLeshe used the Board to have her fired, so to maintain her claim against McCook, she must present evidence that "(1) [DeLeshe] actually harbored discriminatory animus against [her]; and (2) [DeLeshe's] input was a proximate cause of [Scalise] getting fired." *Id.* Because a jury could plausibly find that both factors are present here, Scalise may proceed to trial against McCook.

#### 1. Discriminatory Animus

As noted, there is significant evidence that DeLeshe "actually harbored discriminatory animus against" Scalise. *Id.* His potentially sexually-tinged nickname for Scalise, remarks that she would earn more as a stripper than as a police officer and that she was better suited for employment with Burger King than MPD, and his comment to Huedepohl that "some women don't belong in law enforcement," Doc. 51-3 at 42:12–19, all provide a reasonable justification

21

for a jury to find that he wanted to get rid of Scalise because of her sex. The Court need not further belabor each individual piece of evidence to find that Scalise's evidence satisfies the first prong of the cat's paw test. *See Smith v. Bray*, 681 F.3d 888, 899 (7th Cir. 2012), *overruled on other grounds by Ortiz*, 834 F.3d 760 (subordinate demonstrated requisite discriminatory animus when she "was substantially involved at every stage of [plaintiff's] workplace controversies").

### 2. Proximate Cause

Scalise also has sufficient evidence for a jury to find that DeLeshe was a proximate cause of the Board's decision to fire her. "Proximate cause requires only 'some direct relation between the injury asserted and the injurious conduct alleged,' and excludes only those 'link[s] that [are] too remote, purely contingent, or indirect.'" *Staub v. Proctor Hosp.*, 562 U.S. 411, 419 (2011) (alterations in original) (quoting *Hemi Group, LLC v. City of New York*, 559 U.S. 1, 9 (2010)). The Board's Commissioners each swore that the Board considered Svetich's and DeLeshe's opinions of Scalise before deciding to terminate her. The Board's minutes from the meeting where it voted to terminate Scalise similarly reflect DeLeshe's presence in the executive session prior to the Board's termination vote. Doc. 44-25. Far from being "remote, purely contingent, or indirect," this evidence would allow a jury to conclude that DeLeshe's bias proximately caused the Board to terminate Scalise. *Staub*, 562 U.S. at 419.

McCook disputes the attribution of DeLeshe's motive to the Board, arguing that they decided to terminate Scalise independent of any discriminatory animus DeLeshe may have possessed. But the Supreme Court has noted that while the "decisionmaker's exercise of judgment is *also* a proximate cause of the employment decision, . . . it is common for injuries to have multiple proximate causes." *Id*. And courts should not consider "the ultimate decisionmaker's judgment . . . a superseding cause of the harm." *Id*. So, while the individual

Commissioners each vow that they did not fire Scalise because of her sex, their personal motivations and beliefs do not tell the whole story: the whole point of a cat's paw theory of liability is that the subordinate dupes the superior to act for an ulterior purpose. *See Woods v. City of Berwyn*, 803 F.3d 865, 869 (7th Cir. 2015) ("[T]he phrase comes from one of Aesop's Fables in which a monkey induces a cat, by flattery, to extract roasting chestnuts from the fire."). Here, Scalise has presented sufficient evidence that DeLeshe, potentially motivated by anti-female bias, used his access to the Board to convince it to fire her for nominally legitimate reasons.

The Court finds that there is sufficient evidence for a jury to decide that the Board acted as a cat's paw for DeLeshe's discriminatory animus. Accordingly, Scalise's claim against McCook survives to trial.

### III. Section 1983 Claim Against DeLeshe

The Court now turns to Scalise's § 1983 claim against DeLeshe. DeLeshe advances two arguments in favor of summary judgment. First, DeLeshe argues that he is entitled to qualified immunity because Scalise does not have a viable Title VII claim and therefore no § 1983 claim. Second, DeLeshe argues that the undisputed facts would not allow a jury to decide that he caused Scalise's termination. Both arguments fail.

#### A. Qualified Immunity

Qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotations omitted). Scalise "must show (1) that the defendant violated a constitutional right, when construing the facts in the light most favorable to [her], and (2) that the right was

clearly established at the time of the alleged violation, such that it would have been clear to a reasonable actor that [their] conduct was unlawful." *Archer v. Chisholm*, 870 F.3d 603, 613 (7th Cir. 2017). Although DeLeshe's qualified immunity argument only challenges the first prong of this analysis, for the sake of completion the Court addresses both.

First, DeLeshe's argument against Scalise's claimed constitutional violation fails because it relies on an invalid assumption: that the Court would grant McCook summary judgment against her Title VII claim. As discussed above, Scalise has a viable Title VII claim against McCook and "the standards for proving discrimination and retaliation under Title VII also apply equally to § 1983 claims." Doc. 51 at 18 (quoting *Outley v. City of Chicago*, 354 F. Supp. 3d 847, 872 (N.D. Ill. 2019)); *see also Finke v. Trustees of Purdue Univ.*, No. 12 C 124, 2014 WL 2938384, at *13 (N.D. Ind. June 30, 2014) ("Analysis of [Title VII and § 1983] claims is essentially the same, though individual defendants have no liability under Title VII, whereas they may under § 1983."). Because Scalise's Title VII claim survives against McCook, her § 1983 claim against DeLeshe likewise survives because she bases it on the same evidence.

Second, "the law prohibiting public employers from engaging in sex discrimination in violation of the equal protection clause of the 14th Amendment is well-settled." *Levin v. Madigan*, 697 F. Supp. 2d 958, 972 (N.D. Ill. 2010) (citing *Tamayo v. Blagojevich,* 526 F.3d 1074, 1090 (7th Cir. 2008); *Nanda v. Moss,* 412 F.3d 836, 844 (7th Cir. 2005) ("It has been plain in this circuit for quite some time that arbitrary gender-based discrimination . . . violates the equal protection clause."). Scalise has therefore satisfied her burden to show that DeLeshe is not entitled to qualified immunity, so the Court declines to grant him summary judgment on this basis.

**B.      Causation**

DeLeshe's second argument is that Scalise cannot show that he caused her injury because her cat's paw theory of liability fails.  But, as he does with his argument in favor of qualified immunity, DeLeshe again relies on an unsatisfied conditional premise as the sole basis for obtaining summary judgment.  The Court rejected McCook's arguments against Scalise's cat's paw liability theory above, and it relies on the same reasoning here to hold that a jury could find DeLeshe liable for leveraging the Board as a cat's paw to have Scalise fired due to discriminatory animus.  *See Nichols*, 755 F.3d at 604.

The Court, thus, denies DeLeshe's motion for summary judgment.

## CONCLUSION

For the foregoing reasons, the Court denies Defendants' motion for summary judgment [50].

Dated: July 11, 2024

_____
SARA L. ELLIS
United States District Judge

25